E-filing

BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP
Alan R. Plutzik, Of Counsel (Bar No. 077758)
L. Timothy Fisher, Of Counsel (Bar No. 191626)
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0770
Facsimile: (925) 945-8792

*Attorneys for Plaintiffs*

[Additional Counsel Appear on Signature Page]

FILED

FEB 2 0 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

ADR

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

RODNEY SHIPWAY, Individually and On Behalf
of All Others Similarly Situated,

                            Plaintiff,

            vs.

RIGEL PHARMACEUTICALS, INC., JAMES M.
GOWER, RYAN D. MAYNARD, DONALD G.
PAYAN, RAUL R. RODRIGUEZ, ELLIOTT B.
GROSSBARD, JEAN DELEAGE, BRADFORD S.
GOODWIN, GARY A. LYONS, WALTER H.
MOOS, HOLLINGS C. RENTON, PETER S.
RINGROSE, STEPHEN A. SHERWIN, CREDIT
SUISSE SECURITES (USA) LLC, THOMAS
WEISEL PARTNERS, LLC, OPPENHEIMER &
CO. INC. and JEFFERIES & COMPANY, INC.,

                            Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO.

C09-00766   S1

CLASS ACTION COMPLAINT

**JURY TRIAL DEMANDED**

ORIGINAL

- 1 -

CLASS ACTION COMPLAINT

1    Plaintiff, Rodney Shipway ("Plaintiff"), alleges the following based upon the investigation by

2  Plaintiff's counsel, which included, among other things, a review of the defendants' public

3  documents, conference calls and announcements made by defendants, United States Securities and

4  Exchange Commission ("SEC") filings, wire and press releases published by and regarding Rigel

5  Pharmaceuticals, Inc., ("Rigel" or the "Company"), securities analysts' reports and advisories about

6  the Company, and information readily available on the Internet, and Plaintiff believes that substantial

7  additional evidentiary support will exist for the allegations set forth herein after a reasonable

8  opportunity for discovery.

9                    **NATURE OF THE ACTION AND OVERVIEW**

10       1.       This is a federal class action on behalf of persons who acquired Rigel securities

11  between December 13, 2007 and October 27, 2008 (the "Class Period"), including all persons who

12  purchased or otherwise acquired Rigel common stock pursuant or traceable to the Company's

13  February 2008 Secondary Offering (the "SPO" or the "Offering").  This action asserts strict liability

14  claims under the Securities Act of 1933 (the "Securities Act") and fraud claims under the Securities

15  Exchange Act of 1934 (the "Exchange Act").

16       2.       Rigel is a clinical-stage drug development company that discovers and develops small

17  molecule drugs for the treatment of inflammatory/autoimmune diseases, cancer and viral diseases.

18  The Company's research focuses on intracellular signaling pathways and related targets that are

19  critical to disease mechanisms.   The Company has internal product development programs in

20  inflammatory/autoimmune diseases, such as rheumatoid arthritis and thrombocytopenia, and cancer,

21  as well as partnered product development programs relating to asthma and cancer.

22       3.       Rigel had been in the process of developing a drug compound known as R788 for the

23  treatment of Rheumatoid Arthritis.  R788 is an oral "syk kinase" inhibitor that blocks the activation

24  of mast cells, macrophages and B cells that promote swelling and an inflammatory response.  Syk

25  kinase is an intracellular target that regulates IgE receptor signalling in mast cells and thus prevents

26  cellular activation and subsequent release of multiple chemical mediators.

27       4.       On December 13, 2007, the Company issued a press release which publicized positive

28  results of a clinical trial of R788 (the "Study").  The December 13, 2007 press release was also

CLASS ACTION COMPLAINT

1 appended to the Company's Form 8-K filed with the United States Securities and Exchange
2 Commission ("SEC") filed that same day.

3      5.     In response to the positive news of the results of the Study, the price of Rigel's stock
4 increased $17.95 per share to close at $25.95 per share on December 13, 2007, a 224% increase from
5 the previous day's closing price of $8.00 per share.

6      6.     Subsequently, on or about January 31, 2008, the Company completed its SPO.  In
7 connection with its SPO, the Company filed a Registration Statement and Prospectus (collectively
8 referred to as the "Registration Statement") with the SEC.  The Registration Statement incorporated
9 by reference the Company's December 13, 2007 press release detailing the results of the Study.  The
10 SPO was a financial success for the Company, as it sold more than 5 million shares of stock to
11 investors at a price of $27 per share, for gross proceeds of $135 million.

12      7.     Thereafter, defendants continued to tout the positive results of the Phase II clinical
13 trial of R788.[1]

14      8.     However, on October 27, 2008 the Company shocked investors when it presented the
15 full results of the Study at a meeting of the American College of Rheumatology ("ACR") and on an
16 investor conference call.  Those results contained adverse information that had been omitted form
17 the Company's December 13, 2007 press release and Form 8-K, as well as from the Registration
18 Statement and the subsequent presentations.  Specifically, the Company disclosed that certain
19 patients in the clinical trial taking the compound experienced an increase in blood pressure.

20      9.     Upon the release of this news, shares of the Company's stock plummeted $5.57 per
21 share, or 38 percent, to close on October 28, 2008 at $8.84 per share, on unusually heavy trading
22 volume.

23      10.     The Complaint alleges that, throughout the Class Period, defendants failed to disclose
24 material adverse facts about the Company's clinical trials and prospects.  Specifically, defendants

25 _____

26 [1] Once the initial safety of the study drug has been confirmed in Phase I trials, Phase II trials are
performed on larger groups (20-300) and are designed to assess how well the drug works, as well as
27 to continue Phase I safety assessments in a larger group of volunteers and patients.

28

CLASS ACTION COMPLAINT

failed to disclose or indicate the following: (1) that the R788 Study demonstrated an increase in certain patients' blood pressure, a potential indicator of an increase in cardiovascular risk, which had the potential to cause pharmaceutical companies to reconsider licensing the drug; (2) that patients in the Study taking R788 experienced increased liver enzymes compared to those patients taking the placebo; (3) that patients in Mexico had higher response rates in both the placebo and treated arms than U.S. patients, which may have disproportionately contributed to the overall reported benefit observed at the higher doses; (4) that the Company lacked adequate internal controls; (5) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made; and (6) that the Company's Registration Statement was false and misleading at all relevant times.

11.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

14.    Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act and pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company's Offering was actively marketed in this Judicial District and Rigel's principal place of business is located within this Judicial District.

15.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.    Plaintiff, Rodney Shipway, as set forth in the accompanying certification, incorporated by reference herein, purchased Rigel securities at artificially inflated prices during the Class Period and has been damaged thereby.

17.    Defendant Rigel is a Delaware corporation with its principal place of business located at 1180 Veterans Boulevard, South San Francisco, California.

18.    Defendant James M. Gower ("Gower") was, at all relevant times, the Company's Chief Executive Officer ("CEO"), and Chairman of the Board of Directors.

19.    Defendant Ryan D. Maynard ("Maynard") was, at all relevant times, the Company's Chief Financial Officer ("CFO").

20.    Defendant Donald G. Payan ("Payan") was, at all relevant times, the Company's Executive Vice President of Discovery and Research.

21.    Defendant Raul R. Rodriguez ("Rodriguez") was, at all relevant times, the Company's Executive Vice President and Chief Operating Officer ("COO").

22.    Defendant Elliott B. Grossbard ("Grossbard") was, at all relevant times, the Company's Executive Vice President and Chief Medical Officer.

23.    Defendant Jean Deleage ("Deleage") was, at all relevant times, a member of the Company's Board of Directors.

24.    Defendant Bradford S. Goodwin ("Goodwin") was, at all relevant times, a member of the Company's Board of Directors.

25.    Defendant Gary A. Lyons ("Lyons") was, at all relevant times, a member of the Company's Board of Directors.

26.    Defendant Walter H. Moos ("Moos") was, at all relevant times, a member of the Company's Board of Directors.

- 5 -

1    27.    Defendant Hollings C. Renton ("Renton") was, at all relevant times, a member of the

2  Company's Board of Directors.

3    28.    Defendant Peter S. Ringrose ("Ringrose") was, at all relevant times, a member of the

4  Company's Board of Directors.

5    29.    Defendant Stephen A. Sherwin ("Sherwin") was, at all relevant times, a member of

6  the Company's Board of Directors.

7    30.    The defendants identified in ¶¶ 18-29 are collectively referred to hereinafter as the

8  "Individual Defendants." The Individual Defendants, because of their positions with the Company,

9  possessed the power and authority to control the contents of Rigel's reports to the SEC, press

10  releases and presentations to securities analysts, money and portfolio managers and institutional

11  investors, i.e., the market. Each defendant was provided with copies of the Company's reports and

12  press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the

13  ability and opportunity to prevent their issuance or cause them to be corrected. Because of their

14  positions and access to material non-public information available to them, each of these defendants

15  knew that the adverse facts specified herein had not been disclosed to, and were being concealed

16  from, the public, and that the positive representations which were being made were then materially

17  false and misleading. The Individual Defendants are liable for the false statements pleaded herein,

18  as those statements were each "group-published" information, the result of the collective actions of

19  the Individual Defendants.

20    31.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") operates as an

21  investment bank in the United States. Credit Suisse acted as an underwriter in connection with the

22  Offering.

23    32.    Defendant Thomas Weisel Partners, LLC. ("Thomas Weisel") is an investment bank

24  that offers investment banking, brokerage, research, and asset management services primarily in the

25  United States, Canada, and Europe. Thomas Weisel acted as an underwriter in connection with the

26  Offering.

27    33.    Defendant Oppenheimer & Co., Inc. ("Oppenheimer") is an investment bank and

28  full-service investment firm. Oppenheimer acted as an underwriter in connection with the Offering.

34.     Defendant Jefferies & Company, Inc. ("Jefferies") is a full-service global investment bank and institutional securities firm.  Jefferies acted as an underwriter in connection with the Offering.

35.     The defendants referenced in ¶¶ 31-34 are collectively referred to hereinafter as the "Underwriter Defendants."  The Underwriter Defendants served as financial advisors, and assisted in the preparation and dissemination of Rigel's Offering materials.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

<u>**Background**</u>

36.     Rigel, a clinical-stage drug development company, engages in the discovery and development of novel, small-molecule drugs for the treatment of inflammatory/autoimmune diseases and cancer, as well as viral and metabolic diseases. The company was founded in 1996 and is based in South San Francisco, California.

<u>**Materially False and Misleading**</u>
<u>**Statements Made During the Class Period**</u>

37.     On December 13, 2007, the Company issued a press release entitled, "Rigel's R788 Demonstrates Significant Improvement in Rheumatoid Arthritis in Phase 2 Clinical Study."  Therein the Company stated in relevant part:

> *Rigel Pharmaceuticals, Inc. today announced that its oral syk kinase inhibitor, R788 (tamatinib fosdium), has demonstrated statistically significant results in treating Rheumatoid Arthritis (RA) patients in a recently completed Phase 2 clinical trial.* Groups treated with R788 at 100mg and 150mg po bid (orally, twice daily), showed higher ACR20, ACR50, ACR70 and DAS28 response rates than the placebo group. The efficacy results for the 100mg and the 150mg dose groups were fairly comparable. *Dramatically, the onset of the effect in these dose groups occurred as early as one week after initiation of therapy. We believe that the significant ACR scores and good tolerability observed in this clinical trial, and the further benefit of oral delivery may make R788 a favorable alternative to the currently marketed biological agents.*
>
> \*     \*     \*
>
> "This clinical study has shown that R788 treatment can achieve impressive ACR response rates," said Elliott Grossbard, M.D., senior vice president of medical development at Rigel. "In this clinical trial both the 100mg and 150mg doses improved arthritis symptoms and did so quickly. We plan to initiate the next clinical trial with R788 in RA in 2008," he added.
>
> \*     \*     \*
>
> *James M. Gower, chairman and chief executive officer of Rigel said, "These very important clinical trial results are a major milestone for Rigel as we*

*establish the potential of R788 in RA and its value as an alternative to current therapies. In addition, given these results and the recent results in ITP, we believe that R788 may be a useful drug in the treatment of autoimmune diseases."* [Emphasis added.]

38.     Also on December 13, 2007, the Company filed its Form 8-K with the SEC which attached the above-referenced press release as an exhibit.

39.     That same day, the Company held a conference call with analysts and investors. Defendants Gower, Grossbard, Payan, Maynard and Rodriguez participated in the call, during which, defendants Gower and Grossbard stated the following:

[Gower:] *We were very pleased to be able to announce highly statistically significant results of a Phase 2 trial of 788 in patients with rheumatoid arthritis.* And I would like to introduce Dr. Elliott Grossbard to take us through the study results. Elliott?

\*       \*       \*

[Grossbard:] The efficacy results are shown in the graph on the handout that many of you may have downloaded. As you can see, the highly significant effect for both the ACR 20, 50, 70 and DAS28 score. The p values are uniformly less than .008, usually less than .001. Of note, although not included in this graph, is that the onset of the effect was within one week, and you could see significant differences between the patients at one week after the initiation of treatment.

*We have concluded that the 100 milligram and 150 milligram dose groups have impressive and statistically significant improvements over placebo, and that the onset occurs very, very early.* The efficacy results for the two effective doses were fairly comparable, and the 100 milligrams bid dose kind of caught up by the end so that they were really equivalent. The 50 milligram dose does not appear to be much better than placebo, and so overall there was a good dose response.

*With regard to safety, which is going to be a close focus of the future program, because I think this study fairly establishes with certainty that this drug is effective in rheumatoid arthritis.*

We had a number of dose reductions in the study, either due to ALP elevations, or much more commonly, neutrophil counts below 1500. Typically I would ask the sites to hold the drug until the ALP came back towards normal, or the neutrophil count went above 1500, and then they would restart at half the dose.

\*       \*       \*

*The incidence of reported moderate hypertension was quite low, although the way case report forms are filled out an occasional patients had a notation for his systolic blood pressure increase, and an occasional one had diastolic blood*

- 8 -

*pressure increase. And it is hard to know exactly what that means, so I'm reporting to you here those where the case report forms noted, hypertension of moderate severity. So in conclusion we think the 100 milligram dose was well tolerated. The 150 milligram dose somewhat less so. But with dose reductions almost all the patients were able to finish the study.*

The most common side effects were neutropenia and gastrointestinal side effects and they are most prevalent in the 150 milligram bid dose.

*I think -- my personal opinion is that this study establishes with very little uncertainty that this drug at 100 milligrams a day -- 100 milligrams twice a day or more is highly effective in the treatment of rheumatoid arthritis in terms of clinical signs and symptoms.* We have not investigated the question of bone erosions and joint damage -- we will in a future study.

*The benefits are seen quickly, as early as one week after treatment. And the fact that we're talking here about pills and not injections make this a very interesting compound going forward into our next set of studies.* [Emphasis added.]

40.     Analysts who followed the Company, including CIBC World Markets analyst Brian Abrahams, Jefferies & Company, Inc. analyst Adam A. Walsh, and Credit Suisse analyst Michael Aberman issued analyst reports citing the positive results of the Phase II clinical study reported by the Company.  Credit Suisse analyst Aberman also increased his price target for Rigel's stock from $12 to $25 and wrote, "It is hard to imagine better results than Rigel achieved with R788 in RA and we thing this compound has a good chance of becoming a blockbuster for autoimmune diseases."

41.     Jefferies & Company analyst Walsh also increased his price target for Rigel's stock from $16 per share to $19 per share.

42.     Abrahams reported that CIBC World Markets expected upside in Rigel's stock price because the results of the Phase II clinical study provided "strong proof-of-concept for systemic Syk kinase inhibition in rheumatoid arthritis, and unlocks the potential for the agent to be used in other chronic autoimmune conditions as well."

43.     On December 12, 2007, the day that the defendants announced the results of the Study, Rigel's stock price more than tripled, from $8 per share to $25.95 per share.

44.     On or about January 31, 2008, the Company conducted its SPO.  In connection with the SPO, the Company filed a Registration Statement and Prospectus (collectively referred to as the "Registration Statement.") with the SEC.  The SPO was a financial success, as the Company sold

CLASS ACTION COMPLAINT

1 | more than 5 million shares of Rigel stock to investors at a price of $27.00 per share, for gross

2 | proceeds of $135 million.

3 |      45.    The Registration Statement contained untrue statements of material fact, omitted other

4 | facts necessary to make the statements made therein not misleading, and was not prepared in

5 | accordance with applicable SEC rules and regulations. Specifically, the Registration Statement

6 | stated "the following documents filed with the SEC are incorporated by reference... our current

7 | report on Form 8-K, filed with the SEC on December 13, 2007." The Form 8-K that Rigel filed with

8 | the SEC on December 13, 2007 reiterated the contents of the December 13, 2007 press release

9 | detailed in ¶ 37, *supra*.

10 |      46.    On February 11, 2008, at the BIO CEO Investor Conference, Defendant Gower made

11 | the following statements:

> The Phase II study that we announced in December was a study on 190 patients, double-blind, placebo-controlled in 30 centers in the US and Mexico. We saw rather unprecedented numbers in terms of the ACR scoring. As you can see on the chart, significantly different as is noted by the stars in both the 100 milligram orally BID dose and 150 milligram orally BID dose across the board and all of ACR20, ACR50, ACR70 and DAS scoring. Rather spectacular numbers for the higher two dose groups specifically in the ACR50's and '70s where we got between 50 and 60% ACR50 response and over one-third ACR70's at 90 days which is relatively unprecedented in these kind of studies if you want to look at previous studies done in these same populations with the same protocol.

> This was a very strict intense treat protocol. And done using the same protocols that have been used for pretty much everything from Enbrel on forward, certainly the same protocols and the same, some of the same groups used in the studies done in the last few years with Rituxan and Orencia for approvals IL-6 and the JAK3's in terms of study. So you can never compare studies directly one-to-one that aren't done in exactly the same time but these are using the same protocols and the same approach so they should be roughly comparable.

> *The safety results were also good. We did have two dose dependent toxicities that were noted. One was neutropenia, which we've known from the animal studies on forward that we carry a certain amount of neutropenia along with the mechanism of this growth comes most likely from its ability to regulate adhesion molecules and the monocytes. And there you are seeing a dose dependent matter that increased from about slightly under 10% to just under 20% of between the higher two dose groups.*

> We had pre-specified a protocol based dose reduction, which cut the dose in half for any patients that got a grade 2 neutropenia. This is a neutrophil count of 1500. We didn't see any grade 3 or grade 4 neutropenias in the study, and as many of

CLASS ACTION COMPLAINT

you know those are the ones that are associated with infections. But because this was an early study we wanted to be extra cautious and we cut the dose in half. But when those patients hit a neutrophil count of 1500, all of those patients however did fine on the reduced dose. Actually we got, if you look at those as a group although we didn't -- this is not pre-specified as a statistical endpoint, their ACR20 at 90 days was 82% and those that continued on the study with the dose reductions. So they did quite well and maintained the efficacy and the neutropenia has not recurred nor has anyone dropped off the study because of neutropenia. But it is something which is not uncommon for this patient population. As many of you know, RA patients are predisposed to neutropenia. Methotrexate adds to it. Wheat appears added to that. That is something the rheumatologists have to watch but doesn't seem at this point to be something that is not manageable.

The other thing that we saw that seems dose-related was lower GI disturbance, also something fairly common in this disease. Methotrexate alone as you would notice in the placebo group, those were all methotrexate plus a dummy 788, has a number of patients that have lower GI symptoms. We had a modest number in the intermediate dose group, slightly higher number in the upper dose group. As with the neutropenia no patients found this uncomfortable enough to want to drop off the study. None were hospitalized. None had to be rehydrated. But certainly it is a tolerance issue. *Everything else that showed up is no different between the placebo group and the control group on the safety elements of the study. So, so far, so good.* [Emphasis added.]

47.     On July 8, 2008, at the Collins Stewart 4th Annual Growth Conference, Defendant Rodriguez made the following statements:

Speaking of that, we last year started -- reported a Phase II RA clinical trial. This is the data we deported in December of last year. This is a three-month study looking at R788 in patients with active RA all on a methotrexate background. It's a three-month study looking at those signs and symptoms.

What we saw, and you see in this graph, is that we had some dramatic improvement in the signs and symptoms looking at ACR20, ACR50, and ACR70 at the 100 milligram and the 150 milligram dose groups. This is all b.i.d. The 50 looked pretty much like placebo. The others looked quite dramatically.

In fact compared to other TNF agents or other products that are in the market now or in development now, this is in the higher range of those efficacy measures. So very dramatic improvement. We also saw a couple of things that we saw the benefit occur within the first two weeks of therapy. That is, even within the first week, we are able to see a dramatic improvement in signs and symptoms into the trial. That was sustained throughout the three months of the trial. So very nice results. Per the protocol, if we ran into any trouble with say neutropenia or elevated liver enzymes, the protocol required us to cut the dose in half. That is what occurred in a few cases.

CLASS ACTION COMPLAINT

*You see some of the safety background on these various doses in this chart. We had some cases of neutropenia, five in the 100 milligram and 10 in the 150 milligram dose groups that required the dose to be reduced. A few liver enzymes elevated in 150 milligram. I should note that all the patients that had their dosage reduced, about 18 of them, completed the trial and their ACR20 scores, 82% of them met their ACR20 scores. So they had a very nice benefit even though their dose was reduced.*

So effectively, if you had a benefit it occurred early in the trial and then if you needed your dose reduced it didn't seem to undermine the benefit that you did receive. So we were very satisfied with this. *We had some GI side effects and they were somewhat random and transient, more in the 150 than the 100. A bit of hypertension here and there, but, basically, a fairly good safety profile.*

*The 100 milligram dose group had a very nice and profound efficacy result and a pretty good safety profile. So that is going to be the lead dose that we go forward.* However, the drug does have a very good PKA; we have about a 17-hour half-life. So we are going to try to push that a little bit and see if once a day works.  [Emphasis added.]

48.     Throughout the Class Period, defendants failed to disclose material adverse facts about the Company's clinical trials and prospects.  Specifically, defendants failed to disclose or indicate the following: (1) that the R788 Study demonstrated an  increase in certain patients' blood pressure, a potential indicator of an increase in cardiovascular risk, which had the potential to cause pharmaceutical companies to reconsider licensing the drug; (2) that patients in the Study taking R788 experienced increased liver enzymes compared to those patients taking the placebo;  (3) that patients in Mexico had higher response rates in both the placebo and treated arms than U.S. patients, which may have disproportionately contributed to the overall reported benefit observed at the higher doses; (4) that the Company lacked adequate internal controls; (5) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made; and (6) that the Company's Registration Statement was false and misleading at all relevant times.

### The Truth Begins to Emerge

49.     On October 27, 2008, the Company shocked investors when it presented the full results of the Study at the American College of Rheumatology ("ACR") meeting.  The Company's presentation abstract on R788 stated in part:

CLASS ACTION COMPLAINT

*Results*

Patient demographics and baseline clinical characteristics were similar between groups. 158 of the 189 patients (84%) completed the study including 122 patients (86%) in the R788 treatment groups and 36 patients (77%) in the placebo group. The completion rate was similar among the R788 does groups. The most common reasons for withdrawal were adverse events in the R788 100 mg and 150 mg groups and withdrawal of consent, usually related to the lack of efficacy in the placebo and R788 50mg groups.

Doses of 100 and 150 mg po *bid* were significantly superior to placebo or 50mg *bid* at week 12. Clinical effect was noted as early as week one. There was also a significant decrease from baseline in the biomarkers serum IL-6 and MMP-3 levels (p<0.002) in the 2 higher dose groups (100 mg and 150 mg) as compared to placebo as early as week 1 and at week 12 as well. The major adverse effects were dose related and reversible and included diarrhea (45% with the 150 mg dose) and neutropenia (<1500/mm), which occurred overall in 15% of patients treated with R788. *Other adverse events included dizziness in 11% of patients in the 150mg group and 2% of patients in the placebo group, and HBP occurring in 5% of patients in the higher R788 dose groups and none in the placebo group.*

*Conclusion*

Inhibition of Syk signaling with a relatively selective inhibitor of Syk kinase produced significant clinical benefits in a population of RA patients with active disease on MTX therapy. We are able to define a therapeutic dose based on the efficacy and toxicity results. *The 100 mg bid and the 150 mg bid doses were both effective with similar degrees of clinical response; however, there were more clinical and laboratory adverse events with the 150 mg dose. The rapid onset of the effect, the improvement in arthritis parameters and serum biomarkers show that inhibition of Syk kinase is a viable new target for the treatment of rheumatoid arthritis. Longer term studies are needed to further define the safety and efficacy profile of this drug.* [Emphasis added.]

50.     Following the Company's presentation to the ACR on October 27, 2008, the defendants held a conference call with analysts and investors. During the call Defendants Gower and Grossbard made the following statements:

[Gower:] The issue of the Mexico/US interaction before the study -- I think we actually mentioned this at our original discussion on the Web after the study was over. I was concerned that there might be such an interaction.

And so, I requested before the study was unblinded that we do a country interaction and it turned out there was one. *And the issue of the interaction was that the placebo rate was much higher in Mexico than in the US. And the response rate was much higher in Mexico than the US.*

CLASS ACTION COMPLAINT

* * *

[Grossbard:] Well, Hy's Law, just by way of background, Hy's Law is named after Hy Zimmerman, who noted that when transaminases are elevated and patients are jaundiced, that's bad. And so, FDA has taken that to be a benchmark for significant liver toxicity.

* * *

[O]ur drug does have a liver signal; it's just not a very significant one so far.

* * *

[Unidentified Audience Member:] Hypertension -- can you give us the range?

[Grossbard:] *Okay, well, hypertension is a clinical definition that people have — are attached to people who have high blood pressure. There is (sic) numerous government guidelines about blood pressure that should be treated and so on and so on.*

* * *

*And we have noted, and it is in the paper that's coming out in the next two weeks, that our drug at doses of 100 mg twice a day, for example, over 12 weeks has an average increase in blood pressure of about 4 mm systolic relative to their baseline.* [Emphasis added.]

51.     On this news, shares of the Company's stock fell $5.57 per share, or 38 percent, to close on October 27, 2008 at $8.84 per share, on unusually heavy trading volume.

52.     Various analysts who followed the Company issued reports in which they wrote that the previously undisclosed negative information raised questions about the efficacy and safety of the drug and caused the stock price to plummet.

53.     For example, on October 28, 2008, RBC analyst Jason Kantor downgraded the Company's stock due to "heightened safety concerns for R788," and noted that: (1) the impact of the Mexican data may have overstated the does response; (2) the previously undisclosed increase in blood pressure was viewed as a "potentially significant concern" to independent physicians attending the October 27, 2008 ACR conference; and (3) the new negative information caused one pharmaceutical company to walk away from a potential partnership with Rigel.

54.     Merrill Lynch analyst Berens reported that the detailed presentation revealed a modest, dose-related blood pressure increase with R788, an imbalance in response rates noted at the

- 14 -

1   Mexican trial sites, and more granularity on elevated liver enzymes noted with R788, which were
2   likely to increase regulatory risk for the drug which could delay a partnership with a large
3   pharma/biotech company.

4        55.    Credit Suisse analyst Aberman reported that Rigel had presented the differences in
5   efficacy in Mexico versus the U.S. for the first time in October 2008 and indicated that it was a
6   particular concern because the ratio of Mexican patients to U.S. patients was higher in the higher
7   dosing groups which could skew the data in favor of R788.  Aberman also reported that the
8   magnitude of the increase in blood pressure was disclosed for the first time and that there was no
9   question the increase in blood pressure was one of the risks of the program.  Aberman wrote that
10  increase in blood pressure amongst certain patients was an issue because of the FDA's increased
11  scrutiny over cardiac toxicity and the well-known association of elevated blood pressure with cardiac
12  events.

13       56.    On November 3, 2008, Rigel reported its financial results for the fiscal quarter ended
14  September 30, 2008.  For the third quarter of 2008, Rigel reported a net loss of $37.7 million, or
15  $1.03 per share, compared to a net loss of $18.9 million, or $0.61 per share, in the third quarter of
16  2007. The Company's weighted average shares outstanding for the third quarters of 2008 and 2007
17  were 36.6 million and 31.0 million, respectively.

18       57.    Also on November 3, 2008, the Company held its first ever earnings conference call,
19  but the focus of the call was the toxicity concerns with R788 following the ACR presentation rather
20  than the Company's financial results for the Quarter.  Analysts that followed the Company
21  repeatedly asked questions about the increase in blood pressure and the issued reports.

22       58.    Finally, on November 3, 2008, Credit Suisse analyst Aberman issued a report in
23  which he wrote that "[b]ased on the questions raised in the call, investors clearly remain wary of the
24  toxicity profile of R788 and we think this may not wane until (1) a commercial partnership is signed
25  in 1HO0, and/or (2) Phase IIb data are released in 3Q09." Aberman also wrote that "There is no
26  question that the elevated blood pressure seen in the Phase IIa is a risk for the long term prospects
27  for R788."

28

CLASS ACTION COMPLAINT

1

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

2    59.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

3   Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

4   acquired Rigel's securities between December 13, 2007 and October 27, 2008, including all persons

5   who purchased or otherwise acquired Rigel common stock pursuant or traceable to the Company's

6   January 31, 2008 Offering, and who were damaged thereby (the "Class"). Excluded from the Class

7   are defendants, the officers and directors of the Company, at all relevant times, members of their

8   immediate families and their legal representatives, heirs, successors or assigns and any entity in

9   which defendants have or had a controlling interest.

10    60.    The members of the Class are so numerous that joinder of all members is

11   impracticable.   Throughout the Class Period, Rigel's securities were actively traded on the

12   NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can

13   only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or

14   thousands of members in the proposed Class.  Record owners and other members of the Class may

15   be identified from records maintained by Rigel or its transfer agent and may be notified of the

16   pendency of this action by mail, using the form of notice similar to that customarily used in

17   securities class actions.

18    61.    Plaintiff's claims are typical of the claims of the members of the Class as all members

19   of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is

20   complained of herein.

21    62.    Plaintiff will fairly and adequately protect the interests of the members of the Class

22   and has retained counsel competent and experienced in class and securities litigation.

23    63.    Common questions of law and fact exist as to all members of the Class and

24   predominate over any questions solely affecting individual members of the Class.  Among the

25   questions of law and fact common to the Class are:

26         (a)    whether the federal securities laws were violated by defendants' acts as

27               alleged herein;

28         (b)    whether statements made by defendants to the investing public during the

1               Class Period misrepresented material facts about the business, operations and

2               management of Rigel; and

3        (c)    to what extent the members of the Class have sustained damages and the

4               proper measure of damages.

5      64.    A class action is superior to all other available methods for the fair and efficient

6 adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

7 damages suffered by individual Class members may be relatively small, the expense and burden of

8 individual litigation make it impossible for members of the Class to individually redress the wrongs

9 done to them.  There will be no difficulty in the management of this action as a class action.

10 **UNDISCLOSED ADVERSE FACTS**

11      65.    The market for Rigel's securities was open, well-developed and efficient at all

12 relevant times.  As a result of these materially false and misleading statements and failures to

13 disclose, Rigel's securities traded at artificially inflated prices during the Class Period.  Plaintiff and

14 other members of the Class purchased or otherwise acquired Rigel's securities relying upon the

15 integrity of the market price of Rigel's securities and market information relating to Rigel, and have

16 been damaged thereby.

17      66.    During the Class Period, defendants materially misled the investing public, thereby

18 inflating the price of Rigel's securities, by publicly issuing false and misleading statements and

19 omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not

20 false and misleading.  Said statements and omissions were materially false and misleading in that

21 they failed to disclose material adverse information and misrepresented the truth about the Company,

22 its business and operations, as alleged herein.

23      67.    At all relevant times, the material misrepresentations and omissions particularized in

24 this Complaint directly or proximately caused or were a substantial contributing cause of the

25 damages sustained by Plaintiff and other members of the Class.  As described herein, during the

26 Class Period, defendants made or caused to be made a series of materially false or misleading

27 statements about Rigel's prospects. These material misstatements and omissions had the cause and

28 effect of creating in the market an unrealistically positive assessment of Rigel and its prospects, thus

1  causing the Company's securities to be overvalued and artificially inflated at all relevant times.

2  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff

3  and other members of the Class purchasing the Company's securities at artificially inflated prices,

4  thus causing the damages complained of herein.

5                                  **LOSS CAUSATION**

6           68.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the

7  economic loss suffered by Plaintiff and the Class.

8           69.    During the Class Period, Plaintiff and the Class purchased securities of Rigel at

9  artificially inflated prices and were damaged thereby.  The price of Rigel's securities significantly

10 declined when the misrepresentations made to the market, and/or the information alleged herein to

11 have been concealed from the market, and/or the effects thereof, were revealed, causing investors'

12 losses.

13                               **SCIENTER ALLEGATIONS**

14          70.    As alleged herein, defendants acted with scienter in that defendants knew that the

15 public documents and statements issued or disseminated in the name of the Company were

16 materially false and misleading; knew that such statements or documents would be issued or

17 disseminated to the investing public; and knowingly and substantially participated or acquiesced in

18 the issuance or dissemination of such statements or documents as primary violations of the federal

19 securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of

20 information reflecting the true facts regarding Rigel , their control over, and/or receipt and/or

21 modification of Rigel's allegedly materially misleading misstatements and/or their associations with

22 the Company which made them privy to confidential proprietary information concerning Rigel,

23 participated in the fraudulent scheme alleged herein.

24                      **Applicability of Presumption of Reliance:**
                        **Fraud On The Market Doctrine**
25

26          71.    At all relevant times, the market for Rigel's securities was an efficient market for the

27 following reasons, among others:

28                 (a)    Rigel's stock met the requirements for listing, and was listed and actively

                          traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Rigel filed periodic public reports with the SEC and the NASDAQ;

(c)     Rigel regularly communicated with public investors <u>via</u> established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Rigel was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

72.     As a result of the foregoing, the market for Rigel securities promptly digested current information regarding Rigel from all publicly-available sources and reflected such information in Rigel's stock price. Under these circumstances, all purchasers of Rigel securities during the Class Period suffered similar injury through their purchase of Rigel securities at artificially inflated prices and a presumption of reliance applies.

### NO SAFE HARBOR

73.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Rigel who knew that those statements were false when made.

CLASS ACTION COMPLAINT

**FIRST CLAIM**
Violation of Section 11 of
**The Securities Act Against All Defendants**

74.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class. This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Registration Statement.

75.     This claim is asserted by Plaintiff against all defendants by, and on behalf of, persons who acquired shares of the Company's common stock pursuant to or traceable to the false Registration Statement issued in connection with the February 6, 2008 Offering.

76.     Individual Defendants as signatories of the Registration Statement, as directors and/or officers of Rigel and controlling persons of the issuer, owed to the holders of the stock obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct, and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein. As such, defendants are liable to the Class.

77.     Underwriter Defendants Credit Suisse, Oppenheim and Jefferies & Company owed to the holders of the stock obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein. As such, defendants are liable to the Class.

78.     None of the defendants made a reasonable investigation or possessed reasonable

CLASS ACTION COMPLAINT

grounds for the belief that the statements contained in the Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

79.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reason of the conduct herein alleged, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

80.     As a direct and proximate result of defendants' acts and omissions in violation of the Securities Act, the market price of Rigel's common stock sold in the Offering was artificially inflated, and Plaintiff and the Class suffered substantial damage in connection with their ownership of Rigel's common stock pursuant to the Registration Statement.

81.     Rigel is the issuer of the stock sold <u>via</u> the Registration Statement.  As issuer of the stock, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

82.     At the times they obtained their shares of Rigel, Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

83.     This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Prospectus.

84.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the defendants and each of them, jointly and severally.

## SECOND CLAIM
### Violation of Section 12(a)(2) of
### The Securities Act Against All Defendants

85.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of

1 │ the Class, against all defendants.

2 │       87.    Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered
3 │ pursuant to the Rigel Offering Registration Statement.

4 │       88.    The Rigel Registration Statement contained untrue statements of material facts,
5 │ omitted to state other facts necessary to make the statements made not misleading, and concealed
6 │ and failed to disclose material facts. The Individual Defendants' actions of solicitation included
7 │ participating in the preparation of the false the misleading Registration Statement.

8 │       89.    Defendants owed to the purchasers of Rigel's common stock, including Plaintiff and
9 │ other members of the Class, the duty to make a reasonable and diligent investigation of the
10 │ statements contained in the Offering materials, including the Registration Statement, to ensure that
11 │ such statements were true and that there was no omission to state a material fact required to be stated
12 │ in order to make the statements contained therein not misleading. Defendants knew of, or in the
13 │ exercise of reasonable care should have known of, the misstatements and omissions contained in the
14 │ Offering materials as set forth above.

15 │       90.    Plaintiff and other members of the Class purchased or otherwise acquired Rigel's
16 │ common stock pursuant to and/or traceable to the defective Registration Statement. Plaintiff did not
17 │ know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions
18 │ contained in the Registration Statement.

19 │       91.    Plaintiff, individually and representatively, hereby offer to tender to defendants that
20 │ common stock which Plaintiff and other Class members continue to own, on behalf of all members
21 │ of the Class who continue to own such securities, in return for the consideration paid for that
22 │ securities together with interest thereon. Class members who have sold their Rigel common stock
23 │ are entitled to rescissory damages.

24 │       92.    By reason of the conduct alleged herein, these defendants violated, and/or controlled
25 │ a person who violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiff and members of
26 │ the Class who hold Rigel common stock purchased in the Offering have the right to rescind and
27 │ recover the consideration paid for their Rigel common stock, and hereby elect to rescind and tender
28 │ their Rigel common stock to the defendants sued herein. Plaintiff and Class members who have sold

1   their Rigel common stock are entitled to rescissory damages.

2       93.     This action is brought within three years from the time that the common stock upon

3   which this Count is brought was sold to the public, and within one year from the time when Plaintiff

4   discovered or reasonably could have discovered the facts upon which this Count is based.

**THIRD CLAIM**
**Violation of Section 15 of The Securities Act**
**Against the Individual Defendants**

7       94.     Plaintiff repeats and realleges each and every allegation contained above, excluding

8   all allegations above that contain facts necessary to prove any elements not required to state a

9   Section 15 claim, including without limitation, scienter.

10      95.     This count is asserted against Individual Defendants and is based upon Section 15 of

11  the Securities Act.

12      96.     Individual Defendants, by virtue of their offices, directorship and specific acts were,

13  at the time of the wrongs alleged herein and as set forth herein, controlling persons of Rigel within

14  the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and

15  influence and exercised the same to cause Rigel to engage in the acts described herein.

16      97.     Individual Defendants' position made them privy to and provided them with actual

17  knowledge of the material facts concealed from Plaintiff and the Class.

18      98.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the

19  aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**FOURTH CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

23      99.     Plaintiff repeats and realleges each and every allegation contained above as if fully set

24  forth herein.

25      100.    During the Class Period, defendants carried out a plan, scheme and course of conduct

26  which was intended to and, throughout the Class Period, did: (i) deceive the investing public,

27  including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other

28  members of the Class to purchase Rigel securities at artificially inflated prices.  In furtherance of this

CLASS ACTION COMPLAINT

1 | unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set
2 | forth herein.

3 |      101.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue
4 | statements of material fact and/or omitted to state material facts necessary to make the statements not
5 | misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud
6 | and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high
7 | market prices for Rigel's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-
8 | 5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged
9 | herein or as controlling persons as alleged below.

10 |      102.    Defendants, individually and in concert, directly and indirectly, by the use, means or
11 | instrumentalities of interstate commerce and/or of the mails, engaged and participated in a
12 | continuous course of conduct to conceal adverse material information about Rigel's financial well-
13 | being, business relationships, and prospects, as specified herein.

14 |      103.    These defendants employed devices, schemes and artifices to defraud, while in
15 | possession of material adverse non-public information and engaged in acts, practices, and a course of
16 | conduct as alleged herein in an effort to assure investors of Rigel's value and performance and
17 | continued substantial growth, which included the making of, or the participation in the making of,
18 | untrue statements of material facts and omitting to state material facts necessary in order to make the
19 | statements made about Rigel and its business operations and future prospects in light of the
20 | circumstances under which they were made, not misleading, as set forth more particularly herein,
21 | and engaged in transactions, practices and a course of business which operated as a fraud and deceit
22 | upon the purchasers of Rigel securities during the Class Period.

23 |      104.    Each of the Individual Defendants' primary liability, and controlling person liability,
24 | arises from the following facts: (i) the Individual Defendants were high-level executives and/or
25 | directors at the Company during the Class Period and members of the Company's management team
26 | or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as
27 | a senior officer and/or director of the Company was privy to and participated in the creation,
28 | development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii)

1  each of these defendants enjoyed significant personal contact and familiarity with the other

2  defendants and was advised of, and had access to, other members of the Company's management

3  team, internal reports and other data and information about the Company's finances, operations, and

4  sales at all relevant times; and (iv) each of these defendants was aware of the Company's

5  dissemination of information to the investing public which they knew or recklessly disregarded was

6  materially false and misleading.

7       105.  The defendants had actual knowledge of the misrepresentations and omissions of

8  material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

9  ascertain and to disclose such facts, even though such facts were available to them. Such defendants'

10  material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose

11  and effect of concealing Rigel's prospects from the investing public and supporting the artificially

12  inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of

13  the Company's prospects throughout the Class Period, defendants, if they did not have actual

14  knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such

15  knowledge by deliberately refraining from taking those steps necessary to discover whether those

16  statements were false or misleading.

17       106.  As a result of the dissemination of the materially false and misleading information

18  and failure to disclose material facts, as set forth above, the market price of Rigel securities was

19  artificially inflated during the Class Period. In ignorance of the fact that market prices of Rigel's

20  securities were artificially inflated, and relying directly or indirectly on the false and misleading

21  statements made by defendants, or upon the integrity of the market in which the securities trade,

22  and/or in the absence of material adverse information that was known to or recklessly disregarded by

23  defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff

24  and the other members of the Class acquired Rigel securities during the Class Period at artificially

25  high prices and were damaged thereby.

26       107.  At the time of said misrepresentations and omissions, Plaintiff and other members of

27  the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other

28  members of the Class and the marketplace known the truth regarding the problems that Rigel was

1  experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class

2  would not have purchased or otherwise acquired their Rigel securities, or, if they had acquired such

3  securities during the Class Period, they would not have done so at the artificially inflated prices

4  which they paid.

5        108.   By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange

6  Act and Rule 10b-5 promulgated thereunder.

7        109.   As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the

8  other members of the Class suffered damages in connection with their respective purchases and sales

9  of the Company's securities during the Class Period.

10                                **FIFTH CLAIM**
                           **Violation of Section 20(a) of**
11                  **The Exchange Act Against the Individual Defendants**

12        110.   Plaintiff repeats and realleges each and every allegation contained above as if fully set

13  forth herein.

14        111.   The Individual Defendants acted as controlling persons of Rigel within the meaning

15  of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and

16  their ownership and contractual rights, participation in and/or awareness of the Company's

17  operations and/or intimate knowledge of the false financial statements filed by the Company with the

18  SEC and disseminated to the investing public, the Individual Defendants had the power to influence

19  and control and did influence and control, directly or indirectly, the decision-making of the

20  Company, including the content and dissemination of the various statements which Plaintiff

21  contends are false and misleading.  The Individual Defendants were provided with or had unlimited

22  access to copies of the Company's reports, press releases, public filings and other statements alleged

23  by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the

24  ability to prevent the issuance of the statements or cause the statements to be corrected.

25        112.   In particular, each of these defendants had direct and supervisory involvement in the

26  day-to-day operations of the Company and, therefore, is presumed to have had the power to control

27  or influence the particular transactions giving rise to the securities violations as alleged herein, and

28  exercised the same.

CLASS ACTION COMPLAINT

113.    As set forth above, Rigel and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 20, 2009

**BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP**

_____

Alan R. Plutzik, Of Counsel (Bar No. 077758)
L. Timothy Fisher, Of Counsel (Bar No. 191626)
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0770
Facsimile: (925) 945-8792

- and -

D. Seamus Kaskela
skaskela@btkmc.com
David M. Promisloff
dpromisloff@btkmc.com
Steven D. Resnick
sresnick@btkmc.com
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

CLASS ACTION COMPLAINT

## CERTIFICATION

I, Rodney Kert Shipway, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the Complaint, and authorizes its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's purchase and sale transaction(s) in the Rigel Pharmaceuticals, Inc. (Nasdaq: RIGL) security that is the subject of this action during the Class Period is/are as follows:

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought (B) | Sold (S) | Date | Price per share |
|---|---|---|---|---|---|
| Common Stock | 50 | (B) | | 2/4/08 | $26.64 |
| | | | | | |
| | | | | | |
| | | | | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.    Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners),

6.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below: _____,

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of _February_, 2009.

RODNEY KERT SHIPWAY